

EXHIBIT A

JUN 1 1 2015

**Robert DeBerardine**
*General Counsel*
*Sanofi North America*
55 Corporate Drive – 55A-515A
Bridgewater, NJ 08807
Tel: (908) 981-6600
Fax: (908) 981-7835

June 10, 2015

*VIA OVERNIGHT MAIL*

CDR Krista M. Pedley, PharmD, MS, USPHS
Director
Office of Pharmacy Affairs
Health Resources and Services Administration
5600 Fishers Lane
Rockville, MD 20857

**Re: 340B Ceiling Price for Sanofi U.S.'s Products**

Dear Commander Pedley:

As you know, Sanofi U.S. ("Sanofi") (b) (4) s                                    ,            5) has contacted you through its outside legal counsel, Alice Valder Curran of Hogan Lovells US LLP, to request a meeting with the Office of Pharmacy Affairs ("OPA"). We requested the meeting to discuss Release No. 2011-2, "Clarification of Penny Pricing Policy"[1] ("Release 2011-2"), issued by the Health Resources and Services Administration ("HRSA"), including whether Release 2011-2 is binding on manufacturers. OPA requested that we share our views with the Agency in the form of a letter in advance of a meeting. We therefore are providing this letter to inform OPA of Sanofi's conclusion that Release 2011-2 is not binding and of the company's resulting decision to change its approach to ceiling prices that round or calculate to zero, effective Q3 2015 on July 1, 2015.

Sanofi's practice to date has been to set its ceiling price at $0.01 per unit when the ceiling price calculates or rounds to zero, in accordance with Release 2011-2. Sanofi has now reexamined that practice and concluded that penny pricing is not required, and that alternative approaches are permissible. Accordingly, effective July 1, 2015, Sanofi will adopt the alternative approach of setting a product's 340B ceiling price at the product's Federal Ceiling Price ("FCP") when the calculated 340B ceiling price equals or rounds to zero. This letter explains the basis for Sanofi's decision. Sanofi is willing to meet with you and your staff to discuss this decision in more detail but will implement its decision in the interim. Please let us know as soon as possible if OPA believes

---

[1] Health Resources & Servs. Admin., Dep't of Health & Human Servs., Clarification of Penny Pricing Policy, Policy Release No. 2011-2 (Nov. 21, 2011).



Sanofi's approach is impermissible under the statute or the PPA and, if so, the bases for that position.

As a stakeholder in the 340B program, Sanofi places great emphasis on compliance with all statutory and regulatory requirements pertaining to its government pricing obligations. For that reason, Sanofi has conducted an extensive legal analysis of Release 2011-2 to determine whether implementing alternative approaches to penny pricing is permissible as well as consistent with the overall statutory scheme. Sanofi has concluded that penny pricing is not a requirement of the 340B program, and that, on the contrary, penny pricing is *inconsistent* with the overall statutory scheme. Sanofi also is concerned about the practical implications of applying the penny pricing approach to its products, particularly its (b) (4) product, (b) (4)

We begin by sharing our detailed substantive legal analysis in an effort to thoroughly engage with OPA regarding our evaluation of Sanofi's rights and obligations under the 340B program. The letter then discusses the Sanofi products that currently are subject to penny pricing. Finally, the letter explains the basis for Sanofi's conclusion that the alternative approach Sanofi will implement on July 1, 2015 i.e., setting the 340B ceiling price at the FCP, is a reasonable and permissible alternative to penny pricing and ensures covered entities will continue to access Sanofi products at significant discounts.

### Release 2011-2 Is Not Binding or Enforceable Because It Is Neither Required by Nor Consistent with the 340B Statutory Scheme

A critical threshold question in assessing whether Release 2011-2 is binding on manufacturers is whether the statute itself compels the policy set forth in Release 2011-2. The answer is no: Neither Release 2011-2 nor the penny pricing policy it contains is statutorily compelled. That is because neither Section 340B nor Section 1927 of the Social Security Act (which codifies the Medicaid Drug Rebate Program) contains any provision that directly justifies—let alone compels—penny pricing. The two sections simply recite the relevant formulas, which allow for a range of ceiling prices and do not establish an alternate ceiling price of one cent. The Pharmaceutical Pricing Agreement ("PPA") also does not provide for penny pricing.

The 340B statute and its legislative history contemplate a positive ceiling price in all cases. For example, the statute authorizes manufacturers to charge "a price for a drug that is lower than" the ceiling price and refers to "the amount required to be paid" to the manufacturer.[2] Both phrases suggest a positive, non-zero price. The original legislative history likewise indicates that Section 340B was intended to secure "favorable prices" for covered health care providers.[3] To illustrate the

---

[2] 42 U.S.C. § 256b(a)(1), (a)(10).
[3] H.R. Rep. No. 102-384(II), at 16 (1992).

FOIA Exempt
Trade Secret and Confidential



contemplated discount, the committee report gives an example of a drug discounted from $1.00 per unit to $0.80 per unit.[4]

A venerable canon of statutory construction, the absurdity doctrine, points in the same direction. Requiring pharmaceutical manufacturers to give away unlimited quantities of powerful drugs for free can fairly be characterized as an absurd result, which itself can justify disregard of any statutory language that could be read to counsel such a result. Courts have held that "'[w]here the result of a literal interpretation of statutory language is absurd, or where the obvious purpose of the statute is thwarted by such slavish adherence to its terms, we may look beyond the plain language.'"[5]

A ceiling price of zero also may be unconstitutional. The Constitution generally forbids "arbitrary" or "confiscatory" price controls.[6] As the U.S. Court of Appeals for the Eighth Circuit has explained, "the heart of any confiscatory-rate claim is the ability to show that the government has set a maximum price for a good or service and that the rate is below the cost of production (factoring in a reasonable rate of return)."[7] A ceiling price of zero likely would fail to pass constitutional muster under that test.

On the basis of this statutory and constitutional analysis, Sanofi has concluded that Section 340B does not require manufacturers to make drugs available for free. Indeed, in Release 2011-2, HRSA *itself* recognizes that a zero ceiling price is unreasonable by stating that "it is not reasonable for a manufacturer to set a zero 340B ceiling price."[8]

### Release 2011-2 Is Not Binding or Enforceable Because It Fails to Satisfy Procedural Requirements

The 340B statute plainly does not contemplate, and should not be read to contemplate, a ceiling price that calculates to zero. The next point of inquiry is what *should* be used as the ceiling price in those circumstances. Generally speaking, "where a literal reading of a statutory term would lead to absurd results, the term simply 'has no plain meaning ... and is the proper subject of construction by the [agency] and the courts.'"[9] A binding agency interpretation may be entitled to deference under those circumstances—but only if the usual requirements of Chevron USA, Inc. v. Natural Resources

---

[4] Id. at 15.
[5] See, e.g., Local Union 36, Int'l Brotherhood of Elec. Workers, AFL-CIO v. NLRB, 631 F.3d 23, 27 (2d Cir. 2010) (citation omitted).
[6] Duquesne Light Co. v. Barasch, 488 U.S. 299, 307 (1989); Pennell v. City of San Jose, 485 U.S. 1, 11 (1988).
[7] TCF Nat'l Bank v. Bernanke, 643 F.3d 1158, 1164 (8th Cir. 2011).
[8] Clarification of Penny Pricing Policy, supra, at 1.
[9] American Water Works Ass'n v. EPA, 40 F.3d 1266, 1271 (D.C. Cir. 1994) (citation omitted).

FOIA Exempt
Trade Secret and Confidential

3



Defense Council[10] are met.[11] The next question, then, is whether Release 2011-2 is a binding interpretation of Section 340B.

It is not. HRSA expressly characterized Policy Release 2011-2 as a statement of its "policy," not as a binding interpretation of Section 340B. General statements of policy "lack the force of law."[12] Such a statement "only announces what the agency seeks to establish as policy;" it "does not establish a binding norm" and "is not finally determinative of the issues or rights to which it is addressed."[13] Nor is a policy statement entitled to Chevron deference.[14]

Re-characterizing Release 2011-2 as an "interpretive" rule would not make it binding. To begin with, rules that "state a principle in numerical terms"—like the penny pricing policy—rarely are interpretive because "numerical limits cannot readily be derived by judicial reasoning."[15] Even if Release 2011-2 could be characterized as an interpretive rule, moreover, it would not be enforceable, because interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process."[16] Manufacturers therefore would not be bound by Release 2011-2 if it were an interpretive rule.

Finally, Release 2011-2 cannot be a substantive rule with binding force. Substantive rules must be published in the Federal Register, must undergo public notice and comment, and must ultimately be codified in the Code of Federal Regulations.[17] HRSA did not follow these procedures with respect to Release 2011-2.[18]

**Release 2011-2, If It Were a Substantive Rule, Would Be Set Aside as Arbitrary and Capricious**

As discussed above, Release 2011-2 is neither binding nor enforceable because it is either a policy statement or interpretive rule, in which case it has no legal effect, or a purported substantive rule, in

---

[10] 467 U.S. 837 (1984).

[11] See American Water Works Ass'n v. EPA, 40 F.3d 1266, 1271 (D.C. Cir. 1994).

[12] Christensen v. Harris County, 529 U.S. 576, 587 (2000); Chamber of Commerce of U.S. v. U.S. Dep't of Labor, 174 F.3d 206, 212 (D.C. Cir. 1999).

[13] Chamber of Commerce, 174 F.3d at 212 (quotation marks omitted).

[14] See United States v. Mead Corp., 533 U.S. 218, 226-27 (2001) (agency action is entitled to Chevron deference only if it carries the force of law); Christensen, 529 U.S. at 587 (interpretations contained in policy statements do not warrant Chevron deference).

[15] Catholic Health Initiatives v. Sebelius, 617 F.3d 490, 495 (D.C. Cir. 2010) (quotation marks omitted).

[16] Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 99 (1995).

[17] 5 U.S.C. §§ 552(a)(1), 553(b); 44 U.S.C. § 1510.

[18] See Chrysler Corp. v. Brown, 441 U.S. 281, 313-15 (1979); Natural Resources Defense Council v. EPA, 559 F.3d 561, 565 (D.C. Cir. 2009).

FOIA Exempt
Trade Secret and Confidential



which case it is procedurally defective. In addition, even if Release 2011-2 were a proper substantive rule, it likely would have to be set aside for at least two reasons.

First, Release 2011-2 fails to explain why a ceiling price of zero is, in the words of HRSA, "not reasonable," but a ceiling price of one cent *is* reasonable.[19] The two ceiling prices are indistinguishable for all practical purposes. It was therefore incumbent on HRSA to explain in Release 2011-2 why it drew the distinction it did, for "[a]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."[20] However, Release 2011-2 includes absolutely no rationale for why a mere $0.01 increase of a zero ceiling price transforms the result from inherently unreasonable to not only reasonable, but required. The failure to provide such a reason in this case renders the policy arbitrary and capricious.[21]

Second, HRSA "entirely failed to consider an important aspect of the problem" when it issued Release 2011-2, rendering the policy arbitrary and capricious.[22] When Congress enacted Section 340B, it was concerned about the risk of inappropriate use or diversion of drugs, and we believe such a risk is particularly concerning in the case of drugs that are controlled substances. It included several safeguards in the statute to ameliorate that risk.[23] The penny pricing policy severely exacerbates the risk of inappropriate use and diversion by requiring manufacturers to supply an unlimited amount of drugs to covered health care providers essentially for free.

Sanofi has reviewed the impact that penny pricing has had on the volume of utilization of Sanofi products by 340B covered entities and discovered that utilization of its (b) (4) product increased significantly in the quarters when penny pricing applied, as shown in the following table.

| Product Name | NDC-11 | 340B Volume (Packages) in Last Quarter Before Penny Pricing | 340B Volume (Packages) in First Quarter With Penny Pricing | Percent Increase |
|---|---|---|---|---|
| (b) (4) | | | | |

(b) (4) and therefore presents concerns for abuse and diversion in general. The significant increase in the volume of (b) (4) utilization, which coincided with (b) (4) becoming subject to penny pricing, exacerbates these concerns. Sanofi believes the

---

[19] Clarification of Penny Pricing Policy, supra, at 1.
[20] Kreis v. Secretary of Air Force, 406 F.3d 684, 687 (D.C. Cir. 2005).
[21] See Judulang v. Holder, 132 S. Ct. 476, 490 (2011) ("We must reverse an agency policy when we cannot discern a reason for it.").
[22] AEP Texas North Co. v. Surface Transp. Bd., 609 F.3d 432, 438 (D.C. Cir. 2010) (internal quotation omitted).
[23] See 42 U.S.C. § 256b(a)(5).

FOIA Exempt
Trade Secret and Confidential

5



risk of abuse and diversion created by penny pricing for ▓▓▓ (b) (4) ▓▓▓ is too great for Sanofi, or indeed HRSA, to ignore.

**Employing the Federal Ceiling Price Is a Reasonable Approach.**

On the basis of the foregoing analysis, Sanofi has concluded that neither the 340B statute nor the PPA addresses instances where the ceiling price for a product rounds or calculates to zero, and that Release 2011-2 is neither binding nor enforceable. In the absence of a binding and enforceable policy from HRSA, Sanofi further has concluded that any reasonable interpretation of the 340B statute by a manufacturer is permissible. Sanofi therefore will charge covered entities the FCP, instead of $0.01 per unit of measure, for drugs where the ceiling price rounds or calculates to zero. As we next explain, charging the FCP is a permissible alternative approach to penny pricing.

The Veterans Health Care Act of 1992, the statute that established the 340B program, also created the Department of Veterans Affairs Federal Supply Schedule ("VA/FSS") pricing program.[24] As with the 340B program, if a manufacturer does not participate in the VA/FSS program, its drugs are not eligible for reimbursement under Medicaid or Medicare Part B. Sanofi therefore participates in both the 340B and the VA/FSS programs. Under the VA/FSS program, Sanofi is obligated to make its drugs available for procurement on a Federal Supply Schedule ("FSS") contract and to charge four federal agencies—the U.S. Department of Veterans Affairs, the U.S. Department of Defense, the Public Health Service, and the Coast Guard—a price that is no higher than the FCP.[25]

There are many similarities between the 340B ceiling price and the FCP, which is not surprising because both the 340B program and the VA/FSS program were enacted at the same time through the same legislation. The FCP, like the 340B ceiling price, is calculated on the basis of a statutory formula. The FCP reflects a basic discount (24% of the Non-Federal Average Manufacturer Price) and an inflation-based penalty that varies each year. These components are similar to the unit rebate amount component of the 340B ceiling price, which includes a basic rebate calculated as a percentage of the drug's Average Manufacturer Price, as well as an inflation penalty for innovator drugs. Like the 340B ceiling price, the FCP therefore is lowered when commercial pricing for an innovator drug outpaces inflation. Moreover, increases of the FCP are limited, as the FCP for a current year is capped in most years at the FSS price in place on the prior September 30, increased by inflation.[26]

---

[24] Veterans Health Care Act of 1992 (Public Law No. 102-585). Section 602 established the 340B program; Section 603 established the VA/FSS program.

[25] See 42 U.S.C. § 8126(a) and Master Agreement (MA) § I.

[26] The VA/FSS program permits manufacturers to charge *less* than the statutorily mandated FCP, and (b) (4) ▓▓ (b) (4) ▓▓ Sanofi intends to utilize the FCP as calculated under the statute, and not the voluntarily discounted FSS price, in instances where the 340B ceiling price for the drug rounds or calculates to zero.

FOIA Exempt
Trade Secret and Confidential

6



The important similarities between the VA/FSS and 340B programs form a reasonable basis for Sanofi to make its covered outpatient drugs available to covered entities under the 340B program at the FCP instead of $0.01 per unit in instances where the 340B ceiling price rounds or calculates to zero. This approach is in keeping with the spirit of the 340B statute by continuing to extend statutorily discounted pricing to the 340B covered entities. In fact, applying the FCP results in covered entities accessing Sanofi's drugs at the same price guaranteed to major federal agencies. The FCP for Sanofi's drugs is calculated on the basis of a statutory definition and therefore, unlike $0.01 per unit, is not an arbitrarily chosen figure. In addition, the FSS price (b) (4) (b) (4) is published under the VA/FSS program and can be verified by HRSA and the covered entities.[27]

It is important to note that Sanofi's alternative approach continues to result in significant discounts to covered entities, ranging from approximately (b) (4) of the products' wholesale acquisition cost ("WAC"). The following table lists the Sanofi products that were subject to penny pricing during the second quarter 2015, or will be subject to penny pricing in third quarter 2015, and shows the difference in discounts, measured as a percentage of the highest WAC for the second quarter.



| Product Name | NDC-11 | Penny Pricing Discount as Percentage of WAC | FCP Discount as Percentage of WAC |
|---|---|---|---|
| (b) (4) | | | |

---

[27] The VA/FSS Program directs that the FCP be set at one cent where it otherwise calculates to a zero or negative number. See Amended Master Agreement (MA) § II.B.5. However, the nature of the FCP calculation is that any FCP penny price is in effect for only one year before the calculation again yields a positive result. See Dear Manufacturer Letter (DML), February 11, 1997.

* (b) (4) Our intention regarding products without an FCP would be to utilize the FSS price excluding the Industrial Funding Fee as referenced above.

FOIA Exempt
Trade Secret and Confidential

7



\* \* \* \* \*

We request that HRSA maintain the confidentiality of this letter and of all Sanofi-related information herein to the greatest degree and extent permitted by law. We specifically request that, in accordance with the Freedom of Information Act ("FOIA"), HRSA's FOIA regulations, and Executive Order 12600, HRSA protect all of the information provided in this letter and the accompanying materials from public disclosure. We believe that all of this information constitutes financial and/or confidential commercial information not subject to disclosure under FOIA. Sanofi hereby designates the information in this letter (including all attachments) as exempt from disclosure under Exemption 4 of FOIA. When any of this designated information is requested under the FOIA or otherwise, we request that HRSA notify Sanofi of the request and afford Sanofi the opportunity to submit objections to disclosure.

Thank you for your prompt consideration of this matter.

Sincerely,

Robert DeBerardine
General Counsel, Sanofi North America